No. 81-268

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

                    Plaintiff and Respondent,

        vs.

GARY JOSEPH SWAN,

                    Defendant and Appellant.

Appeal from:   District Court of the Fourth Judicial District,
               In and for the County of Missoula
               Honorable E. Gardner Brownlee, Judge presiding.

Counsel of Record:

        For Appellant:

            Ralph T. Randono argued, Great Falls, Montana

        For Respondent:

            Hon. Mike Greely, Attorney General, Helena, Montana
            Mark Murphy, Assistant Attorney General, argued,
             Helena, Montana
            Robert L. Deschamps III, County Attorney, argued,
             Missoula, Montana

                            Submitted: June 22, 1982

                             Decided: August 19, 1982

Filed: AUG 19 1982

_Thomas J. Kearney_
_____
                        Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

On a writ of habeas corpus from the United States District Court, Missoula Division, defendant appeals his 1972 convictions of second degree assault (section 94-602, R.C.M. 1947, now repealed) and rape (section 94-4101, R.C.M. 1947, now repealed).

On May 11, 1972, defendant was sentenced to six years for the assault and ninety-nine years for the rape conviction by the District Court of the Fourth Judicial District of the State of Montana, Missoula County. According to defendant, his counsel told him that a notice of appeal had been filed. After the time limit for appeal had expired, defendant discovered, however, that a notice had never been filed.

Defendant wrote Chief Justice Harrison in November 1972 seeking a transcript and aid in appealing his conviction. Chief Justice Harrison wrote back to defendant stating:

> "You stated that you requested your attorney to appeal but he did not do so; I am informed that you did discuss an appeal with your counsel but you were advised there was no issue to appeal on.
>
> "I am also advised by the district judge that he did not feel there were any problems upon the trial, nor were any rulings made that could be an issue on appeal. Also that the evidence was clear and your counsel did a good job on your trial.
>
> "You do not need a transcript for an application for a writ of habeas corpus, just make the application and set forth in it wherein you feel your rights were prejudiced. If this court requires some of the testimony to ascertain if what you say is true, we will secure it."

Over the next few years, defendant made several pro se attempts to get a transcript which he believed was neces-

sary in order to perfect an appeal. In 1973, he filed for a writ of mandamus in Federal District Court, which was denied. In September 1978, he filed another writ of mandamus with this Court, seeking court records and transcript, which was also denied. Also, in 1978, defendant began an action in Powell County seeking a declaratory judgment that Montana's former rape statute (section 94-4101, R.C.M. 1947) unconstitutionally discriminated against males. Apparently no action was taken on this petition.

On December 20, 1978, defendant filed a _pro se_ petition for a writ of habeas corpus in the United States District Court, Missoula Division, claiming, among other things, that he was denied a right of appeal. The writ was denied for want of exhaustion of state remedies. See, 36 St.Rep. 746.

In July 1979, the clerk of court's office in Missoula County destroyed the physical evidence of this case.

On May 20, 1980, defendant filed a petition for writ of habeas corpus with this Court, which was denied. (Docket No. 80-184.)

Finally, on September 29, 1980, defendant filed another _pro se_ petition for a writ of habeas corpus in Federal District Court, Missoula Division. The District Court, after a telephone conference in which the State conceded certain facts, issued an order on May 13, 1981, holding that defendant was deprived of his right to appeal because he did not have effective assistance of counsel. The District Court ordered the State of Montana to furnish defendant with a review of his conviction with the assistance of counsel. The District Court further ordered the

State to proceed with diligence in procuring a transcript and appointment of counsel, and to report back to the court as to what has been done within 120 days. This appeal followed.

In Missoula, Montana, on the evening of December 13, 1971, Sharon Briggs, a seventeen-year-old girl, went out drinking with defendant, defendant's wife and a friend of defendant, Rodger Smalley. Defendant and his wife were staying at the "93 Motel." All four people drank beer at the motel room from about 6:30 to 9:00 p.m. They then left the motel and went to a local bar, drinking and dancing for about two more hours. About 11:30 p.m., all four returned to the motel and Briggs asked to be taken home.

The following account was told by Briggs at the trial:

After Briggs asked to be taken home, defendant stayed in the car, apparently willing to drive her home. Defendant's wife and Rodger Smalley went back to the motel room. Briggs sat in the front seat of the car with defendant. When they drove past the street to her house, Briggs again told defendant she wanted to go home. Defendant told her that he wanted to buy some beer first.

After buying the beer, defendant continued to drive south, out of Missoula. When Briggs asked where they were going, defendant said that he was taking her the "long way home." Briggs repeatedly asked defendant to take her home.

After a few miles defendant turned onto the Blue Mountain Road, which was snow-packed and slippery. Defendant's car became stuck a couple of times, but they were able to free it each time until the car slid partially

-4-

off the road. The defendant told Briggs they would have to walk home, and he offered her some beer. When she refused, the defendant hit her on the side of her face with his fist. The defendant ordered the victim out of the car and hit her again, breaking her glasses. When she threw her glasses down, the defendant hit her again and pushed her over a snow bank toward the river. After they had reached the river bank, he hit her again and kicked her.

At this point, according to Briggs, the defendant threatened to make her swim the river and also attempted to remove her pants. He took her pants and panties down and told her he was going to have sexual intercourse with her. She did not resist because she was afraid. Apparently because of the cold, he chose not to have sex with her. He ordered her to get dressed and follow him or he would beat and/or kill her.

After walking some distance, they stopped at a house and asked for a ride back to Missoula. The occupant of the house agreed to give them a ride and later testified he noticed how badly Briggs was beaten but accepted the defendant's story about a bar brawl. He offered to take Briggs to the hospital, but defendant said she was his wife and he would take care of her.

When Briggs arrived back at the defendant's motel, she again requested to be taken home. The defendant's wife was awake when they returned and told Briggs that she could not go home because she was too cold. The defendant and his wife removed the victim's clothing and ordered her into bed between them. When the defendant's wife left to go to the bathroom, Briggs testified that defendant forced her to have

-5-

sexual intercourse with him. Defendant's wife later returned from the bathroom.

When Briggs was sure they were both asleep, she got out of bed and began looking for her clothes. She then, for the first time, realized that Rodger Smalley was sleeping on the couch in the room. When Smalley awoke, at about 5:00 a.m., Briggs was looking for her clothes and asked Smalley to take her home. He refused because he didn't have a car. Briggs then waited for light enough to find her shoes. Once she found her shoes, she went to a nearby shopping mall and called her mother. Her brother picked her up. Upon seeing her condition, he stopped on the way home and called the police. The police met Briggs at home and escorted her to the hospital where she was examined by her physician.

At trial her physician testified that Briggs was "in a pretty sorry state" when he saw her. She was battered and bruised with hemorrhages on the surface and white of the eye. She had dried blood in her nose, a cut lip and scratches on her neck. There were bruises located on her lower right rib cage and on the inside of her right thigh. The X-rays showed that there was a fracture of the jaw on the right side and the sinus in her left cheek had been obliterated by blood and swelling.

A pelvic examination was conducted. No sperm was found in the vaginal cavity, but there were signs of a narrow genital injury.

Before the trial, the State moved for a protective order prohibiting reference to Briggs' morals or chastity. The record shows only that a discussion was held in chambers and that the motion was taken under advisement. The record

does not reflect the District Court's decision on the motion.

Defense counsel gave notice that defendant would use the defense of insanity and made a motion for an order allowing defendant to be examined by a psychiatrist of his own choice, paid by the State. Defendant had already been examined by one psychiatrist at Warm Springs State Hospital. The motion was denied.

At trial the main evidence presented by the State was the testimony of Briggs, the policeman who accompanied her to the hospital and her physician.

The defense called only two witnesses: defendant's previous attorney to rebut hearsay testimony concerning a conversation between defendant and the attorney, and the psychiatrist who examined defendant at Warm Springs State Hospital. The psychiatrist testified that defendant had a below normal I.Q. of approximately 78 and that defendant's ability to appreciate the criminality of his conduct could be impaired because of his low mentality. Neither defendant nor his wife testified at trial.

Defendant's counsel did not present any proposed instructions. Instruction No. 8, a Sandstrom-type instruction, was given to the jury:

> "In every crime or public offense there must
> exist a union or joint operation of act and
> intent, or criminal negligence. The intent
> or intention is manifested by the circum-
> stances connected with the offense and the
> sound mind and discretion of the accused.

> "In order to constitute the offense charged
> in this case the intent alleged in the Infor-
> mation is necessary to be proved, but direct
> and positive testimony is not necessary to
> prove the intent. It may be inferred from
> the evidence if there are any facts proved
> which satisfy the jury, beyond a reasonable

-7-

doubt, of its existence.

"The law also presumes that a person intends the ordinary consequences of any voluntary act committed by him. The latter presumption, however, is termed a disputable presumption and may be controverted by other evidence." (Emphasis added.)

Defendant was charged with second degree assault, rape and kidnapping. The jury returned guilty verdicts on only the assault and rape charges. Defense counsel made a motion for a new trial which was denied.

The controlling issues on appeal are:

1. Whether defendant's rights to counsel, due process and equal protection were violated by the failure to appoint counsel and properly hear his appeal?

2. Whether the defendant was denied a fair trial?

Because both issues must be answered affirmatively, we reverse the judgment of the District Court and remand for a new trial, if enough evidence still exists.

The initial question before this Court is whether or not to apply current law. The State argues that if we apply current law we must do so retroactively. We do not agree. The question of whether or not a rule of law is to be applied retroactively arises only when cases have been "finalized." Cases are generally considered "finalized" only when there has been "a judgment of conviction, sentence and exhaustion of rights of appeal." State v. Rogers (1979), 93 N.M. 519, 602 P.2d 616, 618.

The first issue raised by defendant is whether the State violated his rights to effective assistance of counsel, equal protection, and due process by summarily preventing his initial attempt to appeal. Defendant argues that the failure of the Montana court system to appoint

counsel for him, when it was apparent he was indigent and his trial court counsel was not pursuing his case, was a flagrant violation of his rights. The State contends that defendant's "trials and tribulations" in obtaining an appeal are irrelevant and that the only issues before this Court are issues that would have been presented in an immediate appeal of this case.

If this Court were to follow the State's reasoning, we would be blinding ourselves to the fact that during the ten years defendant sat in prison his rights were being violated. To say that those ten years are irrelevant to the case before us is to ignore a long line of United States Supreme Court cases and Federal District Court cases acknowledging that neither an appellate court nor trial counsel may "sabotage" an appeal by inaction, even if the appeal is thought to be without merit. See, Miller v. McCarthy (9th Cir. 1979), 607 F.2d 854, 857, and cases cited therein.

In the landmark case of Gideon v. Wainwright (1963), 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, the Supreme Court concluded that appointment of counsel for an indigent criminal defendant was a "fundamental right, essential to a fair trial," and that the Fourteenth Amendment requires appointment of counsel in a state court, just as the Sixth Amendment requires it in a federal court. 372 U.S. at 340. In a sister case, Douglas v. California (1963), 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811, the Court applied the Gideon holding to the appellate process, stating that "federal courts must honor his [the indigent defendant's] request for counsel regardless of what they think the merits

of the case may be; and 'representation in the role of an advocate is required.' Ellis v. United States, 356 U.S. 674, 675." 372 U.S. at 357. The Court went on to apply this rule to the California Supreme Court, which had denied appellants' petitions for appeal without a hearing, stating:

> ". . . The present case, where counsel was denied petitioners on appeal, shows that the discrimination is not between 'possibly good and obviously bad cases,' but between cases where the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot. There is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself. The indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal." 372 U.S. at 357.

Under such case law, defendant, as an indigent, clearly had the right to have counsel on appeal.

Nevertheless, an even more important question before this Court is whether the court system undermined his right to counsel by informally and summarily denying his appeal. Clearly, it has.

In Anders v. California (1967), 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493, the United States Supreme Court was confronted with a case very similar to the one now before us. In Anders the court-appointed counsel for an indigent defendant thought there was no merit to the indigent's appeal. The appointed counsel wrote a letter to California's District Court of Appeals, expressing his opinion that the indigent's appeal was without merit. The California court affirmed the conviction after examining the

record.  The Supreme Court of the United States stated that

such a procedure

> ". . . .smacks of the treatment that Eskridge
> received, which this Court condemned, that
> permitted a trial judge to withhold a tran-
> script if he found that a defendant 'has been
> accorded a fair and impartial trial, and in
> the Court's opinion no grave or prejudicial
> errors occurred therein.'  Eskridge v. Wash-
> ington State Board, 357 U.S. 214, 215 (1958).
> Such a procedure, this Court said, 'cannot be
> an adequate substitute for the right to full,
> appellate review available to all defendants
> who may not be able to afford such an expense
> . . ."  386 U.S. at 742-743.

The Court then went on to outline what procedures

would be constitutional in such a case:

> "The constitutional requirement of substan-
> tial equality and fair process can only be
> attained where counsel acts in the role of an
> active advocate in behalf of his client, as
> opposed to that of amicus curiae.  The no-
> merit letter and the procedure it triggers do
> not reach that dignity.  Counsel should, and
> can with honor and without conflict, be of
> more assistance to his client and to the
> court.  His role as advocate requires that he
> support his client's appeal to the best of
> his ability.  Of course, if counsel finds his
> case to be wholly frivolous, after a con-
> scientious examination of it, he should so
> advise the court and request permission to
> withdraw.  That request must, however, be
> accompanied by a brief referring to anything
> in the record that might arguably support the
> appeal.  A copy of counsel's brief should be
> furnished the indigent and time allowed him
> to raise any points that he chooses; the
> court--not counsel--then proceeds, after a
> full examination of all the proceedings, to
> decide whether the case is wholly frivolous.
> If it so finds it may grant counsel's request
> to withdraw and dismiss the appeal insofar as
> federal requirements are concerned, or pro-
> ceed to a decision on the merits, if state
> law so requires.  On the other hand, if it
> finds any of the legal points arguable on
> their merits (and therefore not frivolous) it
> must, prior to decision, afford the indigent
> the assistance of counsel to argue the
> appeal."  386 U.S. at 744.

Here, defendant's counsel not only believed defendant

had no grounds for appeal, but also told defendant he had

filed a notice of appeal when, in fact, he had not. Moreover, defendant's appeal was prevented by this Court by an informal process condemned by the Anders Court.

The State claims that all these errors have been cured because we now grant defendant his right to appeal. We cannot agree in light of the other errors arising out of defendant's trial; errors that include, most blatantly, the issuance of an improper Sandstrom-type instruction, and that cumulatively resulted in an unfair trial of the defendant.

In Parker v. Crist (1980), ___ Mont. ___, 621 P.2d 484, 37 St.Rep. 2048, this Court upheld a Sandstrom-type instruction identical to the one in this case. Our reasoning was based on three grounds: (1) the instruction itself was a permissive inference and not a conclusive presumption; (2) the instructions as a whole made it clear that the State would bear the burden of proving beyond a reasonable doubt every essential element of the crimes charged; and (3) the error, if any, was harmless because the evidence of the requisite intent was overwhelming. 621 P.2d at 486-487.

In State v. Lundblade (1981), ___ Mont. ___, 625 P.2d 545, 38 St.Rep. 441, we limited our reasoning in Parker, stating ". . . we cannot say that the circumstances making the instruction permissible in Parker occurred in the instant case, nor do we know for certain that the United States Supreme Court would find this instruction to be constitutional in this case in light of Sandstrom v. Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 239." 625 P.2d at 549.

Here, two of the alleviating factors listed in Parker do not exist. The instructions, as a whole, fail to place

the full burden of proof on the State, and the evidence of intent is hardly "overwhelming." See also, State v. Hamilton (1980), ___ Mont. ___, 605 P.2d 1121, 37 St.Rep. 70, and State v. Dolan (1980), ___ Mont. ___, 620 P.2d 355, 37 St.Rep. 1860.

Here, as in State v. Kyle (1981), ___ Mont. ___, 628 P.2d 263, 38 St.Rep. 578Q, the instruction cannot be considered harmless because the jury could have easily viewed the instruction as mandatory, and because mental state was a crucial factual question, especially in light of the fact that defendant was claiming the insanity defense.

Such an error, in itself, is cause for reversal and remand. We also note, however, that the trial itself did not meet the fairness and due process standards provided for in Art. II, Sections 17 and 24, 1972 Montana Constitution. This case is similar to State v. Mickelson (1977), 172 Mont. 489, 565 P.2d 308, where we stated:

> ". . . The search for truth was less than vigorous by counsel in this matter and this writer feels that, particularly on a bench trial, the judge has the inherent power, right and yes, duty, to sua sponte demand that a search for the truth be exhausted before the matter be accepted for decision. Otherwise, the defendant, as here, has been denied a fair trial and due process under Art. II, Section 24, 1972 Montana Constitution." 565 P.2d at 311.

We therefore reverse the judgment of the District Court.

Defendant argues that a new trial would be impossible because the physical evidence was destroyed in 1979. Nevertheless, not knowing what evidence still exists, we remand to give the State the opportunity to retry the rape case if sufficient evidence is available. This is not true of the

assault case, as the six-year sentence in that cause has long since been satisfied.

_____
                        Justice

We concur:

_____
        Chief Justice

_____

_____

_____

_____

_____
        Justices